UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
LEE WOODS,

                Petitioner,

- against -

THOMAS LAVALLEY, Superintendent,

                Respondent.
-------------------------------------------------------------X

**MEMORANDUM & ORDER**
12-CV-2339 (RRM)

ROSLYNN R. MAUSKOPF, United States District Judge.

Petitioner Lee Woods brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his March 16, 2009, conviction for aggravated murder in the first degree, attempted aggravated murder in the first degree, and criminal possession of a weapon in the second degree in New York State Supreme Court, Kings County. (Pet. (Doc. No. 1) ¶ 2.) On May 16, 2012, this Court ordered the Attorney General of the State of New York or the District Attorney of Kings County to show cause why a writ of habeas corpus should not issue. (Doc. No. 4.) The District Attorney of Kings County filed a response to the petition on August 8, 2012.[1] (Doc. No. 8.) For the reasons that follow, the petition for a writ of habeas corpus is DENIED.

## PROCEDURAL HISTORY

Petitioner was convicted of aggravated murder in the first degree, attempted aggravated murder in the first degree, and two counts of criminal possession of a weapon in the second degree for his involvement in the shooting of two police officers during a traffic stop. *People v.*

---

[1] By agreement with the Attorney General of the State of New York, the District Attorney of Kings County undertook representation of respondent in this matter. (Resp't's Resp. (Doc. No. 8) ¶ 3.)

*Woods*, 914 N.Y.S.2d 682 (N.Y. App. Div. 2011). On April 1, 2009, the trial court sentenced petitioner to life without parole for the aggravated murder conviction, to be served consecutively to a term of forty years to life for the attempted aggravated murder conviction, and to be served consecutively to two concurrent sentences of twenty-five years to life on the remaining counts. (Pet. ¶ 2.) The New York State Supreme Court, Appellate Division, affirmed petitioner's conviction and sentence on January 18, 2011. *Woods*, 914 N.Y.S.2d at 682. The New York Court of Appeals denied leave to appeal on June 15, 2011. *People v. Woods*, 952 N.E.2d 1106 (N.Y. 2011).

## FACTUAL BACKGROUND

In the early morning on July 9, 2007, two police officers were patrolling Lefferts Avenue in Brooklyn when they came upon a BMW bearing a license plate registered to a different vehicle. (Resp't's Resp., Exs. 1-2 (Doc. Nos. 8-1 & 8-2) ("Trial Transcript") at 79.) The officers, Herman Yan and Russel Timoshenko, signaled the vehicle to pull over. (*Id.*) The vehicle did not immediately comply, turning instead onto a less populated street before pulling to the side of the road. (*Id.* at 82-83.) As Officers Yan and Timoshenko approached the vehicle, they were struck by shots fired from its interior. (*Id.* at 86-88.) Officer Timoshenko fell to the ground and the BMW sped away from the curb, more shots emanating from the rear of the vehicle as Officer Yan returned fire. (*Id.*) Both officers were treated for their injuries; although Officer Yan recovered after undergoing surgery, Officer Timoshenko never regained consciousness. (*Id.* at 350.) The BMW was later found abandoned. (*Id.* at 200-04.)

The investigation led police to petitioner, whom they found at the apartment of the sister of a suspect in the shooting. (*Id.* at 628-32.) Petitioner initially gave several statements denying his presence in the BMW at the time of the shooting and disclaiming any involvement. (*Id.* at

2

660-70.) Confronted with the falsity of certain portions of his statements, however, petitioner eventually admitted that he had driven the BMW during the shooting but insisted that he had not fired any shots. (*Id.* at 677.) Petitioner maintained that the other individuals in the vehicle had forced him to drive away and stated that they separated after abandoning the BMW. (*Id.* at 677-78.)

Surveillance cameras captured the initial stop of the BMW, the shooting, and the perpetrators' flight from the vehicle. (*Id.* at 227-31.) Additionally, police located three guns in a garage near the site of the shooting, a food container, and a few items of clothing. (*Id.* at 738, 743.) Petitioner's fingerprints were found on the BMW and the food container, and his DNA was found on two of the guns and some of the clothing. (*Id.* at 497, 617, 857.) The Kings County District Attorney's Office subsequently charged petitioner with one count of aggravated murder in the first degree, one count of attempted aggravated murder in the first degree, and three counts of criminal possession of a weapon in the second degree. (Pet. ¶ 7.) He was tried with two co-defendants before separate juries, however that proceeding ended in a mistrial after a juror became ill during deliberations. (*See id.* at 3 n.1.) Petitioner was subsequently retried and convicted of aggravated murder in the first degree, attempted aggravated murder in the first degree, and two counts of criminal possession of a weapon in the second degree. *Woods*, 914 N.Y.S.2d at 682. On March 1, 2007, the trial court imposed sentence. (*See* Pet. ¶ 2.)

## STANDARD OF REVIEW

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), federal courts may grant a petition for habeas corpus to a state prisoner for a claim "adjudicated on the merits" in state court only where the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable

3

application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Conversely, claims that have not been adjudicated on the merits are subject to *de novo* review. *Washington v. Schriver,* 255 F.3d 45, 55 (2d Cir. 2001). A state court's factual findings are presumed to be correct and may be overturned only if a petitioner offers "clear and convincing evidence" that the findings were in error. 28 U.S.C. § 2254(e)(1).

A state court adjudicates a petitioner's federal constitutional claims "on the merits" when "it (1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment." *Sellan v. Kuhlman,* 261 F.3d 303, 312 (2d Cir. 2001). The "state court need not mention the argument raised or cite relevant case law in order for its ruling to constitute an 'adjudication on the merits.'" *Brown v. Artuz,* 283 F.3d 492, 498 (2d Cir. 2002) (citing *Aparicio v. Artuz,* 269 F.3d 78, 94 (2d Cir. 2001)). For instance, a state court ruling simply that a claim is "without merit" constitutes an adjudication on the merits of that claim. *See Jimenez v. Walker,* 458 F.3d 130, 146 (2d Cir. 2006) (citing *Fama v. Comm'r of Corr. Services,* 235 F.3d 804, 810-11 (2d Cir. 2000)). Moreover, "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits . . . ." *Johnson v. Williams,* 568 U.S. ___ (2013), slip op. at 10; *cf. Castaldi v. Poole,* No. 07-CV-1420 (RRM), 2013 WL 789986, at *3 (E.D.N.Y. Mar. 1, 2013). "[W]hen a state court fails to articulate the rationale underlying its rejection of a petitioner's claim, and when that rejection is on the merits, the federal court will focus its review on whether the state court's ultimate decision was an 'unreasonable application' of clearly established Supreme Court precedent." *Sellan,* 261 F.3d at 311-12.

Lastly, a federal court may review a petition for a writ of habeas corpus only to the extent that the petitioner has "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A); *see also Caballero v. Keane,* 42 F.3d 738, 740 (2d Cir. 1994). Exhaustion "mandates a habeas petitioner to have 'fairly presented' in state court the claims that are raised in the habeas petition." *Bohan v. Kuhlmann,* 234 F.Supp.2d 231, 243 (S.D.N.Y. 2002), *aff'd,* 66 F. App'x 277 (2d Cir. 2003), *cert. denied,* 540 U.S. 1213 (2004) (quoting *Picard v. Connor,* 404 U.S. 270, 275 (1971)). This means that each legal and factual allegation underlying a claim must first have been fairly presented to a state court. *See Rodriguez v. Hoke,* 928 F.2d 534, 538 (2d Cir. 1991).

## DISCUSSION

Petitioner claims that he was deprived of a fair trial because the trial court (1) improperly permitted the prosecution to "bolster" the testimony of a witness and (2) failed to properly instruct the jury. Respondent counters that petitioner's claims are procedurally barred, unexhausted, or otherwise meritless.

### I. Procedural Bar and Exhaustion

Generally, federal habeas review is not available if the state courts' rejection of a federal claim rested on a state law ground independent of the federal issue that is adequate to support the state courts' decision. *See Coleman v. Thompson,* 501 U.S. 722, 729 (1991); *Fox Film Corp. v. Muller,* 296 U.S. 207, 210 (1935). However, "in the habeas context, a procedural default, that is, a critical failure to comply with state procedural law, is not a jurisdictional matter." *Trest v. Cain,* 522 U.S. 87, 89 (1997); *see also Zarvela v. Artuz,* 364 F.3d 415, 417 (2d Cir. 2004). Moreover, "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the

State." 28 U.S.C. § 2254(b)(2); *Rhines v. Weber*, 544 U.S. 269, 277 (2005) (observing that a "district court would abuse its discretion if it were to grant [a petitioner] a stay when his unexhausted claims are plainly meritless"). Because the Court finds that petitioner's asserted grounds for relief lack merit, it need not consider whether each claim is unexhausted or procedurally barred. *Accord Zarvela*, 364 F.3d at 417; *Lopez v. Lee*, No. 11-CV-2706 (JG), 2011 WL 6068119, at *11 (E.D.N.Y. Dec. 7, 2011). Accordingly, the Court addresses petitioner's arguments on the merits below.

II. **Admission of Prior Consistent Statement**

Petitioner first claims that he was deprived of a fair trial because the trial court improperly permitted "bolstering" of the testimony of Tamika Buggs, a prosecution witness, by allowing the introduction of a prior consistent statement. (*See* Pet. ¶ 83.) At trial, the prosecution called Buggs, a twenty-two year old student who knew petitioner as her aunt's boyfriend, in order to prove that petitioner had hidden and attempted to retrieve the guns used in the shooting. (Trial Tr. at 233-36.) Buggs testified that petitioner and his two co-defendants, Dexter Bostic and Robert Ellis, had helped her move into their apartment and that she was asleep in that apartment on the morning of July 9, 2007. (*Id.* at 238, 257.) Buggs stated that she was awakened early that morning by Ellis, who nervously told her to get up and dress quickly. (*Id.* at 254, 257.) Buggs and Ellis left the apartment and stopped briefly at a fast food restaurant before traveling to Queens. (*Id.* at 268-70.) Once there, they were picked up by a car driven by relatives of Bostic, in which petitioner was a passenger. (*Id.*) The car then collected Bostic as well. (*Id.* at 270-71.) Buggs further testified that, while in the car, petitioner told Bostic that "he couldn't get the guns because it was too many police on the scene." (*Id.* at 272.) According to Buggs, petitioner also stated that petitioner "don't have anything to worry about" because "the

only thing he was guilty of doing was putting the guns where they were at." (*Id.* at 273-74.) Buggs also stated that petitioner told her to "keep my mouth shut or I'll be next." (*Id.* at 272.)

On cross-examination, defense counsel attempted to undermine Buggs' credibility by eliciting testimony that Buggs had been provided with money and lodging by the District Attorney's Office or the New York City Police Department prior to trial. (*Id.* at 299-300.) Defense counsel then impeached Buggs with her testimony in the grand jury and in petitioner's first trial, during which she had offered somewhat different recollections. (*Id.* at 306-10.) In the grand jury, Buggs had stated that Bostic's sister "said that she had went back to the crime scene to pick up the guns from where it all happened." (*Id.* at 308.) And at petitioner's first trial, Buggs had testified that Bostic's sister "said she, her, and [petitioner], and her daughter tried to go back to the crime scene to pick up the guns . . . ." (*Id.* at 309.)

On redirect, the prosecution sought to rehabilitate Buggs by introducing portions of a tape-recorded statement that Buggs had made to an investigating detective and to an assistant district attorney prior to receiving any assistance, which was consistent with Buggs' current testimony. (*Id.* at 313-14.) Defense counsel objected to the introduction of this statement on the ground that the defense was "not arguing recent fabrication" but rather "fabrication from the start," and that the statement offered by the prosecution was therefore inadmissible as a prior consistent statement. (*Id.* at 316, 317.) The trial court overruled the objection and permitted the prosecution to introduce Buggs' statement. (*Id.* at 321-22.) In doing so, the trial court observed that

> [Y]ou indicated somehow, that this gall [*sic*] has come here today and purposely fabricated a whole new set of – a factual scenario that implicates your client. And your impeachment of her was not what, if anything, did [petitioner] say? It was . . . there was a conversation. [Petitioner] didn't say anything, and she was talking to Nicole. And, clearly [the prosecution] has a reference where [Buggs] is now

7

indicating, before she testified, that [petitioner] made a statement about the guns, separate and apart from something that you may have asked about Nicole.

(*Id.* at 316-17.) Defense counsel, however, insisted that he was arguing that "the testimony today, the prior testimony and the testimony given in the tape recorded statement was fabricated, not that it was just fabricated today." (*Id.* at 317.) In response, the trial court stated that

> You are welcome to try to do it. All I am saying at this point . . . is this. You have elicited [testimony] from this witness, after trying to suggest she [ha]s fabricated, brown nosed by the police, and the police gave her $200. [...] And I think the People should be able to respond to that by clearly indicating that she has been consistent all the way along.

(*Id.* at 317-18.) Thus, the trial judge concluded that the prosecution was entitled to introduce the prior tape-recorded statement to respond to defense counsel's suggestion during cross-examination that Buggs fabricated her testimony in exchange for receiving aid. (*Id.*)

Petitioner again argues that Buggs' tape-recorded statement was inadmissible, urging that "because Buggs[] . . . [was] threatened with prosecution for [initially] denying any knowledge about the case . . . before the tape-recorded statement, such statement . . . was also made under the influence of the very motive sought to be rebutted." (Pet. ¶ 93.) Petitioner thus attempts to cast his counsel's challenge to Buggs' credibility at trial as based on some initial pressure exerted by the police to secure Buggs' cooperation. But that characterization is difficult to square – if not flatly inconsistent – with defense counsel's questions concerning the aid Buggs received. The trial court recognized this contradiction, stating that

> [I]t was your [defense counsel's] position that, supposedly, because of the police conduct towards [Buggs], that she came in and she testified the way she testified. But it's clear, sir, from what she testified to, that . . . there may have been, initially, some initial friction. But, ultimately, the police gave her $200, and gave her . . . support. So, it sort of undercuts your theory about being pressured. But, in any event, you chose to go down this road.

8

(*Id.* at 314.) In fact, this very contradiction led the trial judge to inquire as to defense counsel's strategy on cross examination. (*Id.* at 318.) In the end, though the trial court "was a bit surprised by [defense counsel's] efforts to suggest, somehow, that because of the tact [the police] used, that somehow it affected [Bugg's] testimony," for that very reason it held that the prosecution should be permitted to show that Buggs had provided a similar statement prior to any assistance she receive from the authorities. (*Id.* at 318-19.)

Nevertheless, petitioner continues to insist that pressure from the police and the threat of prosecution induced Buggs to manufacture her story from the beginning and that this, petitioner believes, shows the prior consistent statement was *not* given prior to her motive to fabricate and thus should have been excluded. *See, e.g., People v. Seit*, 653 N.E.2d 1168 (N.Y. 1995) (explaining that after a "witness' testimony has been attacked" as recently fabricated, "the witness may be permitted to show that he or she made similar statements at some earlier time when free from the alleged bias"). As the Appellate Division recognized, however, under New York law "the prior consistent statement did not need to predate *all* motives to fabricate." *Woods*, 914 N.Y.S.2d at 682 (emphasis added); *see also People v. Jones*, 734 N.Y.S.2d 125, 126 (2001) ("[T]he court properly admitted various reports prepared by the undercover detective as prior consistent statements . . . [that] predated particular motives to falsify that were asserted by the defense, and there was no requirement that the reports predate all possible motives to falsify."); *People v. Baker*, 244 N.E.2d 232, 239 (N.Y. 1968) ("[W]ere we to accept the defendants' argument, an accomplice's testimony could almost never be rehabilitated – no matter what the nature of the attack on his testimony – since the desire to save one's self from punishment would normally be the predominant motive for perjury of any accomplice."). Even if the admission of the prior statement was erroneous, however, habeas relief typically does not

lie for errors of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). More specifically, courts in this circuit have routinely held that a challenge claiming improper bolstering of a witness' testimony "'really has no place as an issue in criminal jurisprudence based in the United States Constitution,' and is a state law evidentiary issue." *Warren v. Conway*, No. 07-CV-4117, 2008 WL 4960454, at * 21 (E.D.N.Y. Nov. 18, 2008) (quoting *Nieves v. Fischer*, No. 03-CV-9803, 2004 WL 2997860, at *7 (S.D.N.Y. Dec. 28, 2004)) (internal citation omitted).

Petitioner urges, however, that the admission of the statement was so serious as to be "an error of [c]onstitutional magnitude" that deprived him of a fundamentally fair trial as guaranteed by the Due Process Clause. (Pet. ¶ 99.) "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers v. Mississippi*, 410 U.S. 284, 293-94 (1973). Not every error violates due process, however, and the erroneous admission of hearsay is rarely independently sufficient to establish a constitutional violation. *Cf. Washington*, 255 F.3d at 56 (quoting *Agard v. Portuondo*, 117 F.3d 696, 705 (2d Cir. 1997), *rev'd on other grounds*, 529 U.S. 61 (2000), and observing that "[e]rroneous evidentiary rulings rarely rise to the level" of a due process violation); *Alvarez v. Scully*, 833 F. Supp. 1000, 1005 (S.D.N.Y. 1993). "Rather, the writ [] issue[s] *only* where [a] petitioner can show that the error deprived [him] of a *fundamentally fair* trial." *Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir. 1983) (citing *Chambers*, 410 U.S. at 302-03) (emphasis in original).

Petitioner cannot make that showing here. As "this Circuit has never regarded the practice [of bolstering] as inimical to trial fairness," *Orr v. Schaeffer*, 460 F. Supp. 964, 967 (S.D.N.Y. 1978), petitioner must allege more than merely an evidentiary violation to state a cognizable constitutional claim. To determine whether petitioner was afforded due process, this Court asks "whether the erroneously admitted evidence, viewed objectively in light of the entire

record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Collins v. Scully*, 755 F.2d 16, 19 (2d Cir. 1985) (quoting *Nettles v. Wainwright*, 677 F.2d 410, 414-15 (5th Cir. 1982)); *see also Wade v. Mantello*, 333 F.3d 51, 59 (2d Cir. 2003) (applying this test "post-AEDPA"). This is not a case where the purportedly erroneous admission of a prior inconsistent statement resulted in "unconscionable prosecutorial windfalls" or "insurmountable defense disadvantages." *Evans v. Fischer*, 816 F.Supp.2d 171, 197 (E.D.N.Y. 2011). Defense counsel's own impeachment of Buggs demonstrates that petitioner was in no way precluded from challenging or undermining her credibility at trial. Nor did the prosecution "under the guise of rehabilitation . . . offer a hearsay version of the disappointing trial testimony that had so much more jury appeal than the in-court testimony" that it "essentially nullified what had been the principal defense theory." *Id.*

In addition, the record in this case contains substantial evidence of petitioner's guilt. (*See generally* Pet. ¶¶ 7-52; Resp't's Resp. ¶¶ 5-11.) Along with the statement petitioner challenges, at trial the prosecution introduced evidence that petitioner admitted to driving the car from which the officers were shot, that petitioner did not immediately pull the vehicle over when signaled to do so, and that the BMW was stolen and bore pilfered license plates. (Trial Tr. at 82-83, 628, 678.) The prosecution also called witnesses who testified that that the vehicle immediately pulled away after the officers were shot. (*Id.* at 88.) The jury heard evidence suggesting petitioner would have been aware that his co-defendants were preparing to shoot the officers given their positions relative to him and the fact that the loud safety on at least one of the guns would likely have alerted a person in the BMW that the gun was being readied for use. (*Id.* at 495-96, 755.) The prosecution also offered evidence that after the shooting petitioner and his co-defendants abandoned the vehicle and it introduced surveillance videos that showed them

11

running from the scene. (*Id.* at 200-03, 231.) Moreover, the jury heard evidence that a police bloodhound traced a scent from the driver's seat of the BMW to a garage where the guns were discovered (*id.* at 510-20), and learned that petitioner's fingerprint was found on the BMW and on a food container near the weapons while his DNA was found on two of the weapons and on clothing discarded nearby. (*Id.* at 497, 617, 857.) This evidence was presented through the testimony of twenty-nine witnesses; various exhibits; fingerprint, DNA, and ballistics evidence; as well as video surveillance footage. Even if the trial judge mistakenly admitted Buggs' prior consistent statement, there is no indication that its admission removed "reasonable doubt that may have existed on the record without it" or was "so extremely unfair that its admission violates fundamental conceptions of justice." *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998) (quoting *Dowling v. United States,* 493 U.S. 342, 352 (1990)). This is especially true here since, under New York evidence law, "prior consistent statements antedating the motive to fabricate are not introduced to prove or disprove the facts in issue, but to rehabilitate the credibility of the witness." *Seit*, 653 N.E.2d at 1170; *see also People v. McClean*, 508 N.E.2d 140, 141 (N.Y. 1987) ("[P]rior consistent statements which antedated the existence of the motive to fabricate alleged at trial may be admitted, not to prove or disprove any of the facts in issue, but to aid in establishing the credibility of the witness."). On this record, the Court cannot conclude that it was unreasonable or contrary to established Supreme Court precedent for the state courts to find that the admission of the statement did not render petitioner's trial fundamentally unfair.

### III. Jury Instructions

Petitioner also contends that he was deprived of due process when the trial court allegedly failed to provide the jury with proper instructions. (Pet. ¶¶ 100-08.) At the conclusion of the trial, the trial court charged the jury as to the governing law. (Trial Tr. at 956-95.) At a

side bar following the charge, defense counsel objected to the trial court's instruction on the so-called "automobile presumption," arguing that it was not applicable in petitioner's case and would confuse the jurors. (*Id.* at 995.) The trial court had given the following instruction in connection with its instruction on criminal possession of a weapon:

> Now under our law, the presence in an automobile is presumptive evidence of its possession by all persons occupying such automobile at the time such weapon is found. What this means is, if the People have proven beyond a reasonable doubt that any firearm was present in the automobile [and] that the defendant was occupying such automobile at the time such weapon was found, then you may, but you are not required to infer from those facts that the defendant possessed the firearm.

(*Id.* at 985-86.) The trial court overruled the objection. (*Id.* at 995.)

Approximately one hour after the jury began its deliberations, the trial court received a note requesting another reading of the charge with respect to counts of the indictment relating to criminal possession.[2] (*Id.* at 998.) The note also requested clarification of the law with respect to possession of a weapon in a vehicle, asking "[s]pecifically, if defendant is in [a] car with guns, is defendant guilty of criminal possession if he doesn't know the guns are in the car?" (*Id.* at 1003.) Defense counsel suggested that the trial court "reread the elements of criminal possession in the second degree, and explain to the jury that they must find [that] each of those elements have been proven, beyond a reasonable doubt, in order to convict" petitioner. (*Id.* at 999-1000.) Anything more, defense counsel urged, would make the court a "finder of fact" or require a "quasi finding of fact." (*Id.* at 999.) The trial court disagreed, noting that the jury was "asking about [petitioner's] knowledge, which is the mental state for the crime" and stating that "[t]he automobile presumption really only goes to the possession issue, it doesn't go to knowing

---

[2] Because counts three, four, and five of the indictment all charged petitioner with criminal possession of a weapon in the second degree (one count for each of the three firearms recovered), the trial court instructed the jury once as to the elements of the crime and explained that "the law that applies to one, applies to them all." (Trial Tr. at 983.)

possession. It doesn't presume because you possess you know it." (*Id.* at 1000.) At the urging of defense counsel, however, the trial court asked the jury to clarify its request. (*Id.* at 1001-03.) In response, the jury withdrew the original note and instead requested that the portions of the charge concerning the criminal possession counts be reread and asked to review five video clips shown during summations. (*Id.* at 1004.)

Following the jury's viewing of the video clips, the trial court, with the consent of both parties, reread the portion of the charge relating to the criminal possession counts "eliminat[ing] the automobile presumption and simply reread[ing] the charge to reflect the element of knowing possession, without specifying, . . . [a] point in time" at which knowing possession was required. (*Id.* at 1010-19.) Neither the prosecution nor the defense objected to this supplemental charge as given. (*Id.* at 1019.)

Sometime later and after a few more jury notes not relevant here, the trial court received a note asking whether petitioner could "be considered acting in concert regarding the underlying murder" if petitioner "hid the murder weapons after the shooting." (*Id.* at 1037-38.) Defense counsel argued that the court could not answer that question, believing the jury to be "asking this Court whether it should consider a particular piece of evidence[ a]nd also, how it should consider that evidence, which is their province exclusively." (*Id.* at 1038.) The prosecution held a different view, arguing the note required a response and that the appropriate course of action was to repeat the court's instruction that the jury "may consider the person's conduct and all of the circumstances surrounding that conduct" when determining whether petitioner had the requisite intent to be found guilty of acting in concert. (*Id.* at 1038, 1040-41.) Defense counsel persisted, objecting that the jury "ha[d] not asked for a definition of intent or acting in concert." (*Id.* at 1042.) The trial court again disagreed, stating that "[b]y asking this question they are asking for

14

a definition of acting in concert" and that it "would be inclined to give them, again, the two essential elements required in order to convict the defendant . . . [a]nd then, further to define what intent means with respect to that issue" because after "defining that mental state intent, perhaps they may be able to gleam [*sic*] the answer they want ultimately." (*Id.* at 1042-43.) The trial court went on to explain that

> [I]n giving acting in concert, I am trying to give them some guidance as to what mental state is require[d]. It is intentional conduct. And in saying intentional conduct, I think it wouldn't be meaningful unless I were to give them also the definition of intent.

(*Id.* at 1043.) Defense counsel recorded its exception to the trial court's ruling. (*Id.*) The trial court then instructed the jury as to the essential elements of acting in concert as it applied to the crimes charged in the indictment, reread the definition of the crime, and reread the definition of intent. (*Id.* at 1045-49.)

Subsequently, the trial court received another note from the jury seeking clarification on the same topic and asking whether petitioner could be said to have "act[ed] in concert with the shooter in committing aggravated murder and attempted aggravated murder" if he "did not knowingly and willingly participate in the actual shooting of the officers, but did assist the shooter, after the shooting, in escaping from the scene and hiding the weapons." (*Id.* at 1051.) This time all parties were in agreement that the trial court could give no further assistance. (*Id.* at 1052-53.) Thus, the trial judge instructed the jury that

> My role at this trial is similar to any judge's role. I instruct you with respect to the law. I do not decide facts in the case. Your request is asking the Court to make a factual determination, that's not my job. You and you alone decide what the facts are, and you apply it to the law as I give it to you.

15

(*Id.* at 1056.) Neither party objected to this charge as given. (*Id.* at 1019.) Finally, on March 16, 2009, the jury returned its verdict. (*Id.* at 1060-63.)

Petitioner challenges these instructions on two grounds. First, petitioner asserts that the "automobile presumption" instruction – to which defense counsel objected and which was omitted from the rereading of the criminal possession charge – was inapplicable to petitioner's case and confusing to the jury. (Pet. ¶ 104.) Reviewing this argument, the Appellate Division concluded that "[a]ny error in instructing the jury on the presumption . . . was harmless, as there was overwhelming evidence of the defendant's guilt, and no significant probability that the error contributed to his convictions. *Woods*, 914 N.Y.S.2d at 682. Second, petitioner urges that the trial court "invaded the province of the jury" because "providing the intent instruction may have led the jurors to take the specific fact of taking the guns and to apply it to intent formed subsequently to the shooting." (*Id.* ¶ 107.) With respect to this argument, the Appellate Division concluded that any error resulting from the supplemental instructions regarding the criminal possession counts was "unpreserved for appellate review" and "decline[d] to review it in the exercise of [its] interest of justice jurisdiction."[3] *Id.* The Appellate Division also found any remaining contentions raised by petitioner to be "without merit." *Id.*

"The Supreme Court has made it clear that errors in instructions to the jury rarely rise to a constitutional level." *Victory v. Bombard*, 570 F.2d 66, 70 (2d Cir. 1978). Typically, "[i]n order to obtain a writ of habeas corpus in federal court on the ground of error in a state court's

---

[3] Since the state courts that considered petitioner's appeal found that he failed properly to preserve this issue and "[i]t is settled law that the New York rule regarding preservation is generally an independent and adequate state ground," *Nieves v. Artus*, No. 05-CV-3904 (RRM), 2013 WL 628334, at *3 (E.D.N.Y. Feb. 20, 2013), a procedural bar would ordinarily preclude the Court from considering this claim. This principal is important, as "fealty to state procedural rules – and their consequences – respects state judicial processes and encourages adherence to state rules." *Id.* As explained previously, however, because the claim is meritless the Court is not precluded from addressing it here. *Cf. Zarvela*, 364 F.3d at 417.

16

instructions to the jury on matters of state law, the petitioner must show not only that the instruction misstated state law but also that the error violated a right guaranteed to him by federal law." *Blazic v. Henderson*, 900 F.2d 534, 540 (2d Cir. 1990) (quoting *Casillas v. Scully*, 769 F.2d 60, 63 (2d Cir. 1985)). Moreover, "[f]or an erroneous state jury charge to result in a federal constitutional deprivation, 'the ailing instruction by itself must have so infected the entire trial that the resulting conviction violates due process.'" *Blazic*, 900 F.2d at 541 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)) (internal alteration omitted). "[I]t must be established not merely that the instruction is undesirable, erroneous, or even universally condemned, but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Davis v. Strack*, 270 F.3d 111, 123 (2d Cir. 2001) (quoting *Naughten*, 414 U.S. at 146) (internal quotations omitted).

Petitioner does not argue that the trial court misstated or otherwise imparted an erroneous version of state law. Nor does petitioner identify a cognizable federal right that was violated in this case. At most, petitioner claims that these allegedly improper instructions confused the jury or potentially implicitly suggested that that jury consider certain actions by petitioner in determining whether petitioner possessed the requisite intent. (*See* Pet. ¶¶ 104, 107.) In *Henderson v. Kibbe*, 431 U.S. 145 (1977), the Supreme Court noted that a challenger's "burden is especially heavy [where] no erroneous instruction was given" because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Id.* at 155; *see also Blazic*, 900 F.2d at 541. In fact, defense counsel did not object to the supplemental charge omitting the automobile presumption or the trial court's instruction that it was the jury's role to make all factual determinations. (*Id.* at 1019.) "It is the rare case in which an improper instruction will justify reversal of a criminal conviction in which no objection has been made in

17

the trial court." *Kibbe*, 431 U.S. at 154. As the trial court's instructions were correct statements of the law and preserved the proper roles of judge and jury, the Court cannot conclude that the instructions themselves so infected the entire trial that petitioner's conviction violated due process.

Moreover, petitioner's bare speculation that jurors were "confused" or "may have" improperly applied the charge to the evidence does not meet the threshold for constitutional error. Several times during its deliberations, the jury requested and received clarification on the law to be applied. Petitioner does not assert that these instructions misstated the law in any way. Moreover, it is clear that the jury in this case carefully weighed the evidence presented. Before reaching a verdict, the jurors requested the testimony of several witnesses, including that of investigating officers, fingerprint and DNA experts, and cell phone technicians. (Trial Tr. at 1024.) They requested other evidence as well, such as the photographs, charts, and cell phone records offered at trial. (*Id.*) The jury also reviewed the video footage and examined the weapons at issue in the case. (*Id.* at 1056-57.) The Court concludes that, "in the context of the entire record" and as a "practical matter," the outcome of petitioner's trial would not have been different had the trial court omitted the automobile presumption in the first instance or declined to repeat its instruction as to the criminal possession counts. *Blazic*, 900 F.2d at 541. As such, the Court cannot conclude that the state courts' rejection of petitioner's claims was unreasonable or contrary to established Supreme Court precedent.

IV. **Cumulative Error**

Finally, petitioner urges that the "net effect of the [t]rial [c]ourt's erroneous admission of Buggs' prior consistent statement into evidence and its error in instructing the jury rendered [p]etitioner's trial unfair and deprived [p]etitioner of federal due process of law." (Pet. at 42.)

As indicated above, the Court cannot conclude that either of these purported errors rises to the level of a constitutional violation. For similar reasons, the Court does not find that the alleged errors, taken together, establish a violation of the Due Process Clause.

## CONCLUSION

For the reasons stated herein, the petition for a writ of habeas corpus is DENIED. As petitioner has not made a substantial showing of the denial of a constitutional right, the Court declines to issue a certificate of appealability. *See* 28 U.S.C. § 2253; *Soto v. United States*, 185 F.3d 48, 51 (2d Cir. 1999). Pursuant to 28 U.S.C. § 1915(a)(3), the Court certifies that any appeal from this Order would not be undertaken in good faith. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

The Clerk of Court is directed to terminate the petition, close this case, and transmit to petitioner a copy of this Memorandum and Order and the accompanying judgment via U.S. Mail.

SO ORDERED.

Dated: Brooklyn, New York
March 28, 2019

s/Roslynn R. Mauskopf
_____
ROSLYNN R. MAUSKOPF
United States District Judge